[Cite as *State v. Lee*, 2010-Ohio-6450.]

IN THE COURT OF APPEALS OF OHIO
FOURTH APPELLATE DISTRICT
PICKAWAY COUNTY

| | | |
|---|---|---|
| State of Ohio, | : | Case No. 10CA12 |
| Plaintiff-Appellee, | : | |
| v. | : | DECISION AND JUDGMENT ENTRY |
| Donald Wayne Lee, | : | |
| | | **Released 12/21/10** |
| Defendant-Appellant. | : | |

_____

APPEARANCES:

Michael D. Hess, Circleville, Ohio, for Appellant, Donald Wayne Lee.

Judy C. Wolford, Pickaway County Prosecutor, and Jayme Hartley Fountain, Pickaway County Assistant Prosecutor, Circleville, Ohio, for Appellee, State of Ohio.

_____

Harsha, J.

{¶1}     Donald Lee appeals from his convictions for felonious assault and domestic violence.  Tammy Suttles, Lee's roommate and romantic partner, claimed that Lee brutally attacked her after she returned home from a bar.  Lee denied attacking Suttles and claimed that she was injured before she arrived home.

{¶2}     On appeal, Lee contends that the trial court erred by admitting unauthenticated medical records.  However, the hospital certification contained sufficient evidence to allow the jury to decide whether the accompanying records belonged to the victim and related to the injuries she received on the date in question, i.e., whether the records were what they purported to be.  Therefore, the trial court correctly admitted the records for the jury's review.

{¶3}    Lee also argues that his conviction was against the manifest weight of the evidence because investigating police officers found no injuries on his hands after the attack occurred.  However, this was the only fact in the record arguably indicating that Lee may not have attacked Suttles.  Substantial evidence supported Suttles' testimony that Lee attacked her.  Accordingly, we affirm the judgment of the trial court.

I.  Summary of the Facts

{¶4}    A grand jury indicted Lee on one count of felonious assault, a second degree felony, and one count of domestic violence, a first degree misdemeanor.  He pleaded not guilty and was tried by jury, which returned a guilty verdict on both counts.  The trial court subsequently sentenced Lee to six years on the felonious assault count and six months on the domestic violence charge, to be served concurrently.

{¶5}    The transcript of the trial reveals that Lee and Suttles were involved in a romantic relationship and lived together at Suttles' trailer.  After Suttles picked Lee up from his workplace on the day of the attack, they purchased pizza and two forty-ounce beers on their way home.  Suttles testified that Lee began arguing with her in the car, although Lee denied this.

{¶6}    At the trailer, the two shared the beer and watched television.  Suttles claimed that Lee began to argue with her again and she decided to leave.  Once more, Lee denied that the two argued.  He testified Suttles was quiet and he did not know why she left.  Lee said he continued to watch the football game that was on the television.

{¶7}    Suttles testified that she drove her vehicle a couple blocks to a local bar.  She went into the bar, sat for two hours by herself, and consumed two beers.  She then drove back home.

{¶8}    Suttles claimed that she entered the trailer and immediately proceeded to her bedroom in order to avoid speaking with Lee, but he followed her into the bedroom. Lee then began attacking her – hitting and choking her.  He eventually stopped, apologized, and said he would call the police.  Suttles told Lee that she would call the police instead and ran to her neighbors' trailer for help.

{¶9}    Lee claimed that he heard Suttles' vehicle pull up to the trailer.  She then "blew through the door" towards her bedroom.  Lee noticed Suttles had blood smeared on her face.  When he tried to corner her in the bedroom to determine what was going on, she spit blood on the floor and in his face.  Lee stated that Suttles was screaming and kicking and he grabbed her to try to calm her down.  She then rubbed her face on his gray sweatshirt, smearing it with blood.  Lee explained that she may also have scratched him as they were "tussling."  Lee testified that he turned to get a wash cloth from the bathroom to clean her face but she ran out of the trailer.  Lee could not explain why Suttles would state that he hurt her, but alluded that she held a grudge because she had called the police on him before and the police did nothing.

{¶10}  Jennifer Williams testified that she was a guest of a neighbor who owned a nearby trailer.  She observed Suttles come to the trailer door with her face covered in blood and say "look what he did to me."  Suttles entered the trailer and Jennifer and others washed the blood off her face.  Eric Williams testified that Lee approached the trailer soon after Suttles arrived and said "I didn't do it."  Williams noted that Lee was wearing a gray sweatshirt that had blood on the shoulder.  Someone in the trailer responded, "Well buddy you have blood all over your shirt."  Lee then left.

{¶11}   Police arrived and began to investigate.  Lee told Officer Doug Anderson that his roommate had been in an altercation and had come home with blood on her face.  Lee informed Anderson that he had been wearing a white tee-shirt and a brown flannel all day.  He denied wearing any other upper body clothing.  During his investigation, Anderson located a gray sweatshirt that was turned inside out in a dirty laundry hamper in the bedroom.  It had bloody marks on the right shoulder.

{¶12}   Anderson and several other police officers inspected Lee's hands and found no evidence of any wounds or injuries, though they noticed some "old scabs."  Anderson admitted on cross-examination that Lee appeared calm.  Another officer noted that he observed some scratches on Lee's neck and under one of his eyes.

{¶13}   Sergeant Robert Chapman was the lead investigator on the case.  At trial, he noted that most of the injuries occurred on the right side of Suttles' face and she had sustained broken orbital bones.  After meeting with Suttles and noting the severity of her injuries, he determined that Lee should be charged with felonious assault as well as domestic violence.

{¶14}   The jury chose to believe the state's witnesses and found Lee guilty of both counts.

## II. Assignments of Error

{¶15}  Lee presents the following two assignments of error:

First Assignment of Error:

DEFENDANT WAS DENIED HIS RIGHT OF CONFRONTATION AND CROSS
EXAMINATION WHEN THE COURT ALLOWED UNAUTHENTICATED
MEDICAL RECORDS INTO EVIDENCE ABSENT ANY DIRECT TESTIMONY.

Second Assignment of Error:

APPELLANT'S CONVICTION WAS AGAINST THE MANIFEST WEIGHT OF THE EVIDENCE.

### III. The Medical Records

**{¶16}** In his first assignment of error, Lee argues that the trial court erroneously allowed the state to introduce unauthenticated hospital records at trial. The state contends that the records were properly authenticated, but even if they were not, there was sufficient other evidence of Suttles' injuries in the record to sustain the jury verdict.

### A. Failure to Object

**{¶17}** Although neither party has raised the issue, we must first resolve whether Lee has properly preserved this alleged error for our review, i.e., Lee never objected to the admission of the medical records on the ground that they were not properly authenticated.

**{¶18}** During Suttles' direct examination, the state produced medical records as she was describing the injuries she received from the attack. Lee's counsel objected when the state asked her whether the records she received were "accurate." The court sustained this objection and Suttles continued discussing the extent of her injuries, but without addressing the accuracy of the medical records. Before the close of the state's case when each exhibit was offered, Lee's counsel posed no objection to the admission of the medical records. Thus, we conclude Lee did not properly preserve the issue of authentication. As a general rule, appellate courts will not review an alleged error that was not objected to at trial at the time the error is said to have occurred. *State v. Slagle* (1992), 65 Ohio St.3d 597, 604, 605 N.E.2d 916. "[The rule's] purpose is practical: to prevent the defensive trial tactic of remaining silent on a fatal error during trial with the

expectation of demanding a reversal on appeal if the verdict is guilty." *State v. Craft* (1977), 52 Ohio App.2d 1, 4-5, 367 N.E.2d 1221.

**{¶19}** However, in the context of criminal appeals, the harshness of this general rule is mitigated by Crim.R. 52(B). "The rule provides that: 'Plain errors or defects affecting substantial rights may be noticed although they were not brought to the attention of the court.' This rule allows the appellate court, at the request of appellate counsel or *sua sponte,* to consider a trial error that was not objected to when that error was a 'plain error.'" *Slagle* at 604, quoting Crim.R. 52(B).

**{¶20}** For a reviewing court to find plain error: (1) there must be an error, i.e., "a deviation from a legal rule"; (2) the error must be plain, i.e., "an 'obvious' defect in the trial proceedings"; and (3) the error must have affected "substantial rights," i.e., it "must have affected the outcome of the trial." *State v. Barnes,* 94 Ohio St.3d 21, 27, 2002-Ohio-68, 759 N.E.2d 1240. Furthermore, the Supreme Court of Ohio has stated that "[n]otice of plain error under Crim.R. 52(B) is to be taken with the utmost caution, under exceptional circumstances and only to prevent a manifest miscarriage of justice." *State v. Long* (1978), 53 Ohio St.2d 91, 372 N.E.2d 804, at paragraph three of the syllabus. Based upon the lack of a proper objection, we review the admission of the medical records for plain error.

B.  Remote Authentication of Medical Records

**{¶21}** Statements made outside of the courtroom, offered at trial to prove the truth of what they assert, are generally inadmissible as "hearsay" unless an exception applies.  Evid.R. 801(C); Evid.R. 802; *State v. DeMarco* (1987), 31 Ohio St.3d 191, 195, 509 N.E.2d 1256.  Medical records are admissible under the "records of regularly

conducted activity" exception to the hearsay rule. Evid. R. 803(6). When a party offers a record into evidence, the record must be properly identified or authenticated "by evidence sufficient to support a finding that the matter in question is what its proponent claims." Evid.R. 901(A).

{¶22} R.C. 2317.422 provides that hospital records can be properly authenticated by a certification of the custodian of the hospital records. The statute states in part:

> (A) * * * the records, or copies or photographs of the records, of a hospital, * * * in lieu of the testimony in open court of their custodian, person who made them, or person under whose supervision they were made, may be qualified as authentic evidence if any such person endorses thereon the person's verified certification identifying such records, giving the mode and time of their preparation, and stating that they were prepared in the usual course of the business of the institution. Such records, copies, or photographs may not be qualified by certification as provided in this section unless the party intending to offer them delivers a copy of them, or of their relevant portions, to the attorney of record for each adverse party not less than five days before trial. Nothing in this section shall be construed to limit the right of any party to call the custodian, person who made such records, or person under whose supervision they were made, as a witness.

{¶23} Thus, hospital records may be remotely authenticated if the custodian of the records: (1) endorses on the records his or her certification identifying the records; (2) gives the mode and time of the records' preparation; and (3) states that the records were prepared in the usual course of business. Additionally, the proponent must deliver the records or the relevant portion of them to the opposing party at least five days before trial.

{¶24} Here, the certification page, signed by Lori Martin, "Patient Information Director," was dated and notarized on December 29, 2009. At the top of the form it identifies Suttles as the patient, by name, date of birth, social security number, and her

account number.  It also provides "D.O.S. 10/17/2009," which we presume means "Date

of Service" indicating the date Suttles was treated at Berger Health System.  There is a

blank underlined space after "Number of pages being certified."   Below this, the form

states:

> The copies of records for which this certification is made are true and complete reproductions of the original medical records, which are housed in the Medical Records Department at Berger Health System located at 600 North Pickaway St. Circleville Ohio, 43113.  The original Records were made in the regular course of business and it was the regular course of business of the Berger Health System Medical Record Department to make such records at or near the time of the matter recorded.  The custodian of the records in lieu of his/her personal appearance gives this certification pursuant.

{¶25}  Lee argues that the admitted medical records do not comply with R.C.

2317.422 for two reasons.  First, Lee contends that the certification page did not

address the mode and time of preparation, only stating that the records were created "at

or near the time of the matter recorded."  The state contends that this certification is

sufficient.

{¶26}  We disagree with Lee that the certification form lacked a description

of the "mode and time" of the preparation of the medical records.  The

certification states that the records were made by the Berger Health Medical

System Record Department "at or near the time of the matter recorded."  All the

pages of the medical records contain some reference to the date of "service" or

the date that the records were prepared.  Thus, the mode, by the "Berger Health

Medical System Record Department," and the time, "at or near the time of the

matter recorded" were sufficiently described in the certification form.

**{¶27}** Second, Lee argues that the certification form, by failing to indicate the number of pages being certified, failed to sufficiently "identify the records" under R.C. 2317.422. The state contends that there is no requirement for listing the number of certified pages under R.C. 2317.422. We agree that the certification form does not identify what records are being certified either by describing the records or, at a minimum, by identifying the number of pages within the certified packet of records. However, we agree with the state that such an omission is not fatal.

**{¶28}** The purpose of the authentication requirement is simply to establish that the item is what the proponent of its admission purports it to be. See Evid.R. 901(A). Moreover, under Evid.R. 901(A), the court does not decide whether the evidence is authentic. That decision is left to the jury. The court's role in this regard is that of a "gatekeeper," simply deciding if the proponent has presented enough evidence of authentication to allow the jury to decide the authenticity of the document or exhibit. See Giannelli & Snyder, Rules of Evidence Handbook (2009), Article IX, Authentication and Identification, Authors' Comments. Like most questions of admissibility, we entrust this decision to the sound discretion of the trial court.

**{¶29}** Evid.R. 901(B)(10) specifically provides for authentication by "*[m]ethods provided by statute or rule.*" R.C. 2317.422 noted above establishes simplified methods for authenticating hospital records in conjunction with Evid.R. 901(A). Thus, we must simply determine whether the certification provided by the hospital complies with the requirement in R.C. 2317.422 of "identifying such records," i.e., to allow the factfinder to determine whether they are what they purport to be.

**{¶30}** Here the certification includes: (1) the name of the patient, Tammy Suttles; 2) her date of birth, 10/31/1963; 3) the patient's account number, BV0107349532; and 4) the D.O.S. (date of service), 10/17/2009. Almost without exception, the records that follow the certification contain most of, if not all of, the same information on their face. Thus, there can be little question that the records attached to the certification belong to the victim and relate to injuries which she received, and for which she was treated, on October 17, 2009. This foundational evidence clearly passes the authentication requirements of Evid.R. 901(A) and R.C. 2317.422.

**{¶31}** That being the case, it is equally clear there can be no plain error in the absence of any error whatsoever. *Barnes*, supra, at 27.

**{¶32}** Moreover, assuming solely for the sake of argument that our analysis is incorrect, no plain error exists because exclusion of the hospital records would not have changed the outcome of the trial.

**{¶33}** Here, the medical records arguably aided the state in proving the "serious physical harm" element of felonious assault and the "physical harm" element of domestic violence as they describe Suttles' injuries in great detail. However as we note under the second assignment of error, there was substantial other evidence that proved serious physical harm beyond a reasonable doubt. Specifically, Suttles testified about the injuries she received and a number of grisly photographs were admitted depicting their severity. Clearly, the jury had other reliable evidence upon which it could have determined, beyond a reasonable doubt, that Lee caused serious physical harm to Suttles. We are confident that the exclusion of these records would have had no effect

on the ultimate jury verdict, i.e., the admission of the medical records was not "outcome determinative" as required by *Barnes*, supra, at 28.

**{¶34}** In sum, we hold that no error occurred in the trial court's admission of the medical records. And, assuming without deciding that the certification form insufficiently identified the records it was certifying, the exclusion of the records would have had no effect on the outcome of the trial. Consequently, this assignment of error is meritless.

### IV. Manifest Weight of the Evidence

**{¶35}** In his second assignment of error, Lee challenges the jury's guilty verdicts as being against the manifest weight of the evidence. Specifically, he argues that the evidence demonstrated that he had no visible injuries on his hands. He contends that his hands would have had some injuries after delivering damaging blows to Suttles' face. He also argues that there was "little or no blood" found in the bedroom, which supports his version of events at trial, i.e., that the attack did not take place in the trailer.

**{¶36}** The state argues that the greater weight of evidence supports Lee's conviction. The state notes that: (1) Suttles testified unequivocally that Lee attacked her; (2) blood evidence was located in the bedroom where Suttles alleged she was attacked; (3) Lee's gray sweatshirt had blood on it; and (4) Lee initially lied about wearing the sweatshirt when the attack took place. In sum, the state argues that it presented an "exhorbitant" amount of evidence demonstrating that Lee committed the crimes and the only evidence that remotely weighs in Lee's favor was the absence of injuries on his hands.

**{¶37}** In determining whether a criminal conviction is against the manifest weight of the evidence, an appellate court must review the entire record, weigh the evidence

and all reasonable inferences, consider the credibility of witnesses and determine whether, in resolving conflicts in the evidence, the trier of fact clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed. *State v. Thompkins*, 78 Ohio St.3d 380, 387, 1997-Ohio-52, 678 N.E.2d 541, citing *State v. Martin* (1983), 20 Ohio App.3d 172, 175, 485 N.E.2d 717. A reviewing court "may not reverse a conviction when there is substantial evidence upon which the trial court could reasonably conclude that all elements of the offense have been proven beyond a reasonable doubt." *State v. Johnson* (1991), 58 Ohio St.3d 40, 42, 567 N.E.2d 266, citing *State v. Eskridge* (1988), 38 Ohio St.3d 56, 526 N.E.2d 304, at paragraph two of the syllabus.

{¶38} Even in our role as a thirteenth juror, we are constrained by the rule that the weight to be given evidence and the credibility to be afforded testimony are issues ordinarily to be determined by the trier of fact. *State v. DeHass* (1967), 10 Ohio St.2d 230, 227 N.E.2d 212, at paragraph one of the syllabus. The fact-finder "is best able to view the witnesses and observe their demeanor, gestures and voice inflections, and use these observations in weighing the credibility of the proffered testimony." *Seasons Coal Co. v. Cleveland* (1984), 10 Ohio St.3d 77, 80, 461 N.E.2d 1273 (per curiam). Thus, we will only interfere if the fact-finder clearly lost its way and created a manifest miscarriage of justice.

{¶39} We have reviewed the entire trial record and are confident that the jury did not "lose its way" in finding Lee guilty of felonious assault and domestic violence.

{¶40} Suttles testified that Lee attacked her in her bedroom. Consistent with this claim are photographs of the bedroom – clearly showing a significant amount of blood

and blood "splatter" in various parts of the bedroom.  Grisly photographs also depict Suttles on the evening of the accident with significant injuries to the right side of her face and a large amount of swelling over her entire face.  Police found no blood in the car that Suttles drove home from the bar.

{¶41}  Soon after the alleged attack, Lee was observed by a witness wearing a gray sweatshirt with blood on the right shoulder.  He was not wearing the sweatshirt later when police arrived to investigate.  He claimed having only worn a white undershirt and brown flannel.  Lee admitted that he "forgot" he was wearing the blood-stained gray sweatshirt after police found it lying inside-out in a dirty laundry hamper inside the trailer.

{¶42}  Lee claimed that Suttles spat blood in the bedroom in a sort of hysteria (we are uncertain whether spitting blood could reproduce blood "splatter"; there was no evidence in the record in this regard at trial).  Lee could not satisfactorily explain, however, why Suttles would attempt to "frame" him, how she could arrive home in a car with such injuries without getting blood in the interior of the car, or why he "forgot" he was wearing the gray sweatshirt during the incident.

{¶43}  The lack of any apparent injuries on Lee's hands that night could be some evidence that he did not repeatedly and forcefully hit Suttles that night.  This, however, was the only evidence that could reasonably weigh in Lee's favor.  The jurors could also reasonably conclude that Lee attacked Suttles without sustaining apparent injuries on his hands.

{¶44}  The jurors clearly chose to believe Suttles' version of events, which was supported by substantial evidence.  Evidence indicating that Lee did not commit the

crime was minimal at best. This is not one of the rare cases where the jurors clearly lost their way in arriving at a guilty verdict. Accordingly we overrule this assignment of error.

## V. Conclusion

**{¶45}** No error, plain or otherwise, occurred when the trial court admitted the medical records; Lee's convictions for felonious assault and domestic violence are not against the manifest weight of the evidence. Consequently, we affirm the judgment of the trial court.

JUDGMENT AFFIRMED.

## **JUDGMENT ENTRY**

It is ordered that the JUDGMENT IS AFFIRMED and that Appellant shall pay the costs.

The Court finds there were reasonable grounds for this appeal.

It is ordered that a special mandate issue out of this Court directing the Pickaway County Common Pleas Court to carry this judgment into execution.

IF A STAY OF EXECUTION OF SENTENCE AND RELEASE UPON BAIL HAS BEEN PREVIOUSLY GRANTED BY THE TRIAL COURT OR THIS COURT, it is temporarily continued for a period not to exceed sixty days upon the bail previously posted.  The purpose of a continued stay is to allow Appellant to file with the Supreme Court of Ohio an application for a stay during the pendency of proceedings in that court. If a stay is continued by this entry, it will terminate at the earlier of the expiration of the sixty day period, or the failure of the Appellant to file a notice of appeal with the Supreme Court of Ohio in the forty-five day appeal period pursuant to Rule II, Sec. 2 of the Rules of Practice of the Supreme Court of Ohio.  Additionally, if the Supreme Court of Ohio dismisses the appeal prior to expiration of sixty days, the stay will terminate as of the date of such dismissal.

A certified copy of this entry shall constitute the mandate pursuant to Rule 27 of the Rules of Appellate Procedure.  Exceptions.

Abele, J. & Kline, J.:  Concur in Judgment and Opinion.

For the Court

BY: _____
        William H. Harsha, Judge

### NOTICE TO COUNSEL

**Pursuant to Local Rule No. 14, this document constitutes a final judgment entry and the time period for further appeal commences from the date of filing with the clerk.**